UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PETER SUNG OHR, Regional Director of Region 13 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, | ) ) ) ) | 18 C 8414 |
| Petitioner, | ) ) | Judge Gary Feinerman |
| vs. | ) ) | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO, | ) ) ) ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

In response to certain union protest activities, Donegal Services, LLC and Ross Builders, Inc. filed unfair labor practices charges against International Union of Operating Engineers, Local 150, AFL-CIO, before the National Labor Relations Board ("NLRB" or "Board"). Region 13 of the NLRB issued a consolidated complaint and pursued the charges, and an Administrative Law Judge ("ALJ") issued a decision finding in favor of the NLRB General Counsel on some issues and Local 150 on others. *IUOE, Local 150 (Donegal Services, LLC)*, 13-CP-227526 (N.L.R.B. Dec. 13, 2019) (reproduced at Doc. 96). The ALJ's decision is currently under review before the NLRB. *IUOE, Local 150 (Donegal Services, LLC)*, NLRB, https://www.nlrb.gov/case/13-CP-227526 (last visited Apr. 2, 2020).

Meanwhile, Petitioner Peter Sung Ohr, the Regional Director of Region 13, filed a petition in this court under Section 10(*l*) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(*l*), seeking interim injunctive relief against Local 150 pending final disposition of the NLRB administrative proceeding. Docs. 1, 12. Following limited discovery, Docs. 43, 45,

1

72 (Castillo, C.J.), the parties cross-moved for summary judgment, Docs. 73, 77. Local 150's motion is granted, and the Regional Director's motion is denied.

**Background**

As the parties cross-move for summary judgment, the court ordinarily would view the facts in the light most favorable to Local 150 when considering the Regional Director's motion and in the light most favorable to the Regional Director when considering Local 150's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). But because the court will grant Local 150's motion and deny the Regional Director's, the facts are set forth as favorably to the Regional Director as the record and Local Rule 56.1 permit. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Local 150 is a labor organization within the meaning of the NLRA. Doc. 92 at ¶ 2. Donegal is an Illinois corporation engaged in the business of residential demolition, excavating, sewer, and water. *Id*. at ¶ 3. At all relevant times, Local 150 and Donegal have been engaged in a labor dispute. *Id*. at ¶ 9. Beginning around May 2018, Local 150 pursued organizational activities at Donegal. *Id*. at ¶ 38. On July 10, 2018, Local 150 began posting stationary banners, signs, and large inflatable rats—colloquially known as "Scabby the Rat," Doc. 89 at ¶ 9—at Donegal's facility in Lemont, Illinois. Doc. 92 at ¶ 12. On July 11, 2018, Local 150 began picketing Donegal. Doc. 89 at ¶¶ 7, 19.

From about July to December 2018, Donegal provided services to or utilized the services of Greenscape Homes, Provencal Construction, Overstreet Builders, Boughton Materials, Settler's Hill, Elmhurst Chicago Stone, WillCo Green, Andy's Frozen Custard, and Ross Builders. Doc. 92 at ¶ 8. Except for WillCo Green, which is a joint employer with Donegal by virtue of their sharing management and employees, control over labor relations, and tools and equipment, Local 150 has not been engaged in a primary labor dispute with any of those neutral or secondary employers. *Id*. at ¶ 10; Doc. 90 at 7-9 (where the Regional Director does not contest the relationship between Donegal and WillCo Green).

At some point after it started picketing Donegal, Local 150 began posting rats, stationary banners, and signs at the secondary employers' facilities. Doc. 92 at ¶¶ 16-35. The banners, which read "Shame on [company name] for harboring rat contractors" or "Shame on [company name] for using rat contractors," were posted near the entrance of each facility. *Id*. at ¶¶ 16, 19, 23, 25, 28, 30, 32, 34. The banners were approximately four feet tall by six feet wide and staked into the ground on a public right-of-way facing public streets. Doc. 89 at ¶ 9. The inflatable rats were approximately twelve feet tall. *Ibid*. At no time did Local 150 deploy a traditional ambulatory picket at a banner site at the secondary employer locations, and union agents supervising the banner sites were prohibited from having picket signs while bannering. *Ibid*. Local 150 did, however, engage in traditional picketing activity at Boughton when Donegal trucks were present at Boughton's worksite. *Id*. at ¶ 24.

Following a settlement agreement—not yet approved by the Regional Director—between Local 150 and Donegal as to other unfair labor practices charges, Local 150 ceased picketing Donegal. *Id*. at ¶ 71. Local 150 has also ceased its use of inflatable rats, stationary banners, and

3

signs at the secondary employer locations, with the possible exception of WillCo Green. Doc. 92 at ¶¶ 18, 22, 24, 27, 29, 31, 33, 35.

The Regional Director presents evidence of other events pertinent to this case. During Summer 2018, a Local 150 agent appealed to and ordered Settler's Hill employees to interfere with the unloading of a Donegal truck. *Id.* at ¶ 13. In July 2018, Local 150 agents appealed to and ordered Boughton employees to refuse to load Donegal trucks. *Id.* at ¶ 14. In September 2018, Local 150 informed Boughton that the union might engage in "picketing activity" at its facilities if it continued to allow a firm named RSS, a Donegal ally, to pick up material for Donegal. *Id.* at ¶ 15.

At least one object of Local 150's conduct has been to make the secondary employers cease doing business with Donegal. *Id.* at ¶ 36. Local 150 also has aimed to force or require Donegal to recognize or bargain with it as the representative of Donegal employees even though it has not been certified as the employees' representative. *Id.* at ¶ 37.

After the parties' cross-motions for summary judgment in this case were fully briefed and argued, the ALJ issued her decision in the NLRB administrative proceeding. Doc. 96. The ALJ concluded that the display of stationary banners and inflatable rats at the secondary employer locations, absent picketing or other coercive conduct, was not unlawful. *Id.* at 31-35. The ALJ also found that Local 150 did not commit an unfair labor practice through its conduct at Settler's Hill. *Id.* at 38. Still, the ALJ found that Local 150 had engaged in unfair labor practices by: (1) picketing Donegal for more than 30 days with, at least in part, a recognitional or organizational motive, in violation of Section 8(b)(7)(C) of the NLRA, *id.* at 21-22, 38; (2) displaying stationary banners and rats in the presence of ambulatory picketing at Boughton and Elmhurst-Chicago Stone in a manner that made those displays violate Sections 8(b)(4)(i)(B)

4

and 8(b)(4)(ii)(B) and, in Elmhurst-Chicago Stone's case, Section 8(b)(7)(C), *id*. at 35-39; and (3) threatening to engage in unlawful picketing against Boughton, in violation of Section 8(b)(4)(ii)(B), *id*. at 37, 39.  As noted, the ALJ's decision is currently under review by the Board.

**Discussion**

The Regional Director asks this court to enjoin Local 150 from engaging in allegedly unlawful Donegal-related protest activities—in particular, the "posting [of] large inflatable rats and banners"—at the secondary employer locations.  Doc. 12 at 9-10.  This case is not an administrative review of the ALJ's decision, but rather a concurrent "petition … for appropriate injunctive relief pending the final adjudication of the Board with respect to [the] matter," which Section 10(*l*) requires the Regional Director to seek as to a charge alleging unlawful secondary activity if, following a preliminary investigation, he has "reasonable cause to believe [the] charge is true."  29 U.S.C. § 160(*l*).

"[B]efore issuing a 10(*l*) injunction, the district court must first analyze whether the regional director had reasonable cause to seek an injunction; second, the judge must apply the traditional test in equity to determine whether an injunction would be 'just and proper.'"  *Kinney v. IUOE, Local 150*, 994 F.2d 1271, 1277-78 (7th Cir. 1993).  "In a reasonable cause inquiry, [the court] ask[s] only whether disputed issues could be resolved by the Board in favor of the regional director's position, and the regional director is given the benefit of the doubt."  *Id*. at 1278 (citations omitted).  "The inquiry is narrow, although the court should examine the Board's legal theories as well as its depiction of facts."  *Ibid*.  "In the somewhat more searching inquiry into the likelihood of success on the merits, the court must find that the petitioner's chances are better than negligible, no matter how heavily other equities weigh in [his] favor."  *Ibid*.  (internal

5

quotation marks omitted).  While the court ordinarily owes some deference to the Regional

Director's legal theories, *see Squillacote v. Int'l Bhd. of Teamsters, Local 344*, 561 F.2d 31, 33-

34 (7th Cir. 1977), deference is not owed where the Regional Director advances an interpretation

of the NLRA "in a way that limits the work of" a different law, including the United States

Constitution, "which the agency does not administer," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612,

1629 (2018); *see also Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union

No. 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005) ("[B]ecause of the First Amendment backdrop in

this case, ordinary principles of deference to Board interpretation of the [NLRA] do not apply

here.").  "[I]f the Board through its regional director cannot establish reasonable cause, it is

unnecessary to embark on the more involved inquiry required to find that an injunction is 'just

and proper.'" *Kinney*, 994 F.2d at 1278 n.9.  Because the Regional Director does not show

reasonable cause, the court's inquiry begins and ends there.

"Subsection (b) of section 8 of the NLRA, 29 U.S.C. § 158(b), defines certain actions by

labor organizations or their agents as unfair labor practices." *Landgrebe Motor Transp., Inc. v.

Dist. 72, Int'l Ass'n of Machinists & Aerospace Workers*, 763 F.2d 241, 244 (7th Cir. 1985).

"Among other things, the subsection defines certain secondary boycotting and secondary

picketing as unfair labor practices." *Ibid*.  "Secondary activity may be defined as activity in

which the union applies economic pressure to a person with whom the union has no dispute

regarding its own terms of employment in order to induce that person to cease doing business

with, and thereby increase the pressure on, another employer, called the primary employer, with

whom the union does have such a dispute." *Ibid*.

Pertinent here, Section 8(b)(4) makes it unlawful secondary activity for a union or its

agents to (i) "induce or encourage any individual employed by any person engaged in commerce

6

or in an industry affecting commerce" to withhold certain services from the individual's employer—here, the secondary employers—or (ii) "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce"—again, the secondary employers—where the union engages in such coercive conduct with a prohibited object, including that of "(B) forcing or requiring any person … to cease doing business with any other person"—here, the primary employer, Donegal. NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). The Supreme Court has limited the scope of Section 8(b)(4) to avoid interpreting it in a manner that would raise serious constitutional problems by penalizing protected speech. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988). Thus, while Section 8(b)(4) proscribes coercive secondary activity like picketing, it does not reach "peaceful" non-picketing communication like handbilling. *See id*. at 577-88. Picketing may be restricted because it "is qualitatively different from other modes of communication"—it is the *conduct* involved in an ambulatory, patrolling picket line, and not its *communicative element*, that "often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id*. at 580 (internal quotation marks omitted). "[A] defining characteristic of picketing is that it creates a physical barrier between a business and potential customers, thereby keeping employees away from work or keeping customers away from the employer's business." *520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 720 (7th Cir. 2014) (internal quotation marks omitted).

By contrast, because peaceful non-picketing activities "depend entirely on the persuasive force of the idea" expressed, not on threatening nonspeech conduct, they cannot be restricted without violating the First Amendment. *Edward J. DeBartolo Corp.*, 485 U.S. at 580 (internal quotation marks omitted). Given this, a wide range of practices fall beyond the scope of

7

Section 8(b)(4) precisely because they do not impose physical barriers or coerce behavior in some other way. *See*, *e.g.*, *Sheet Metal Workers Int'l Assoc., Local 15 (Brandon Reg'l Med. Ctr.)*, 356 N.L.R.B. 1290, 1291 (2011) (concluding that it was not an unfair labor practice for a union to display large inflatable rats at a secondary employer location, where the protesting workers did not engage in "violence, blocking ingress or egress or similar direct disruption of the" secondary employer); *Sheet Metal Workers' Int'l Assoc., Local 15 v. NLRB*, 491 F.3d 429, 437-38 (D.C. Cir. 2007) (holding that it was not an unfair labor practice for a union to stage a "mock funeral" meant "to dissuade consumers from patronizing [a] secondary employer"); *Overstreet*, 409 F.3d at 1202 (holding that it was not an unfair labor practice for a union to display "four foot by fifteen foot banner[s] that read 'SHAME ON [NAME OF RETAILER]' in large red letters … anywhere from twenty to several hundred feet from … [r]etailers' entrances," where the protesters did not "block the entrances … or directly confront individual customers … through chants, shouts, or any other means" and instead "remained generally stationary and quiet throughout their bannering activity"). Such "unsettling or even offensive" conduct, iconography, and messaging are constitutionally protected, and thus beyond Section 8(b)(4)'s reach, because they do not constitute the type of coercive conduct, like picketing, "by which a person of ordinary fortitude would be intimidated." *Sheet Metal Workers*, 491 F.3d at 439.

The Regional Director does not identify any evidence showing that the union engaged in a campaign of traditional ambulatory picketing against the secondary employers. Doc. 93-1 at 5 (declining to challenge the union's view that "this case involves no traditional picket signs"). Although the Regional Director's brief suggests that Local 150 engaged in traditional picketing and refers to "photographic exhibits showing [Local 150] picketing," Doc. 75 at 8, the cited paragraphs of his Local Rule 56.1(a)(3) statement assert only that the union picketed *Donegal*

and erected stationary banners and inflatable rats at the secondary employer locations. Doc. 92 at ¶¶ 16-35. To characterize the display of banners and rats as "picketing" is to assume, incorrectly, precisely the legal conclusion the Regional Director is trying to advance.

Although the ALJ's opinion delves into credibility determinations about various witnesses' testimony concerning instances of alleged picketing, the Regional Director generally elides those factual disputes and instead focuses almost entirely on the rats and banners. The Regional Director makes a passing reference to the Summer 2018 incident involving a single individual bearing a picket sign who allegedly instructed Settler's Hill employees not to unload a Donegal truck, Doc. 90 at 10, but he does not—and could not—urge the court to issue an injunction based on the need to enjoin activity that has long since ceased. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.") (citation omitted). Rather, the Regional Director contends that the Settler's Hill incident, along with the two non-picketing but potentially coercive incidents involving Boughton, provides context that alters how the court should understand the coercive effect of the rats and banners. Doc. 93-1 at 5-6 (arguing that the union's "posting of rats and banners did not happen in a vacuum"). That contention fails to persuade, as the Regional Director does not adequately support his position that a few isolated incidents justify recasting the settled meaning of otherwise peaceful non-coercive conduct, particularly where those incidents have not recurred and no argument is made they will.

9

More significantly, the First Amendment strongly counsels against straining to construe as coercive a union's use of stationary banners and inflatable rats. In determining whether non-picketing conduct is impermissibly coercive, "the Supreme Court has cautioned [courts] to be especially careful not to label expressive union conduct as coercive if such an interpretation could interfere or limit free speech." *520 S. Mich. Ave. Assocs.*, 760 F.3d at 723. Significantly, as the Seventh Circuit made clear just last year, "there is no doubt that a union's use of Scabby to protest employer practices is a form of expression protected by the First Amendment." *Const. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1123 (7th Cir. 2019). Peaceful bannering likewise is quintessential protected speech. *See Carlson v. California*, 310 U.S. 106, 113 (1940) ("[P]ublicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state."); *Overstreet*, 409 F.3d at 1210-12 (holding that "interpreting the [NLRA] to prohibit" peaceful "bannering activity would pose a 'significant risk' of sanctioning a violation of the First Amendment"). So even if some contextual features of Local 150's overall approach made this a close case—and they do not—the First Amendment precludes the application of Section 8(b)(4) to Local 150's use of stationary banners and inflatable rats.

The Regional Director advances two other arguments in urging the contrary result: (1) the union's use of stationary banners and inflatable rats amounted to "signal" picketing; and (2) the use of banners and rats, even if not picketing, was sufficiently coercive to lose its First Amendment protection. That inflatable rats and stationary banners are First Amendment-protected speech forecloses both arguments—the Constitution defines the outer bounds of the

NLRA's proscriptions, not the other way around. While the analysis could end there, there are other grounds for rejecting the Regional Director's arguments.

As to the first argument, for conduct to qualify as signal picketing, "the evidence must prove that the alleged conduct would reasonably be understood by [a secondary employer's] employees as a signal or request to engage in a work stoppage against their own employer." *Sw. Reg'l Council of Carpenters (New Star General Contractors, Inc.)*, 356 N.L.R.B. 613, 616 (2011). Because "a union may want to communicate with employees of secondary employers about a labor dispute for many reasons other than to induce them to stop work," a court may "not find, without any further evidence, that employees of secondary employers … would reasonably understand" communications directed at them "to be implicitly sending the message forbidden by Section 8(b)(4)(i)(B)." *Id*. at 617-18. Because the Regional Director does not explain how the evidence would support such a finding, there is no basis here to hold that Local 150 engaged in signal picketing.

It is telling that the Regional Director's signal picketing argument relies entirely on "common situs" cases, Doc. 75 at 5-6, where the simultaneous presence of ambulatory picketing at a work site shared by a primary and secondary employer could lead the secondary employer's employees to be "misled or coerced into observing the picket line" by the presence of so-called "observers" at neutral gates. *Sheet Metal Workers Local 19 (Delcard Assocs.)*, 316 N.L.R.B. 426, 438 (1995) (internal quotation mark omitted), *enf. denied on other grounds*, 154 F.3d 137 (3d Cir. 1998). As Local 150 correctly notes, Doc. 91 at 10-12, this case does not involve ambulatory picketing at a common situs with reserved gates, and the Regional Director makes no argument for extending the signal picketing doctrine beyond that limited context. The Regional Director does observe that WillCo Green maintained the kind of "reserve gate" system present in

11

common situs cases, Doc. 90 at 7-9; 93-1 at 8, but he neglects a key point—his failure to offer any evidence of an actual ambulatory picket elsewhere at WillCo Green that activity at the neutral gate might have coerced WillCo Green's employees to obey. Doc. 89 at ¶¶ 48-49. (The Regional Director's point also fails because, as discussed at greater length below, WillCo Green is a joint employer with Donegal.)

As to the Regional Director's second argument, it is at least theoretically possible for the use of stationary banners and inflatable rats to be coercive, and thus unlawful, even if it does not qualify as "picketing." *See 520 S. Mich. Ave. Assocs.*, 760 F.3d at 720 ("Although broad picketing or boycotting of a neutral entity is the paradigmatic case of coercive secondary activity, it is not the only behavior prohibited under the statute. … [W]e may find that certain aspects of the Union's conduct could be persuasive or coercive in ways that distinguish it from both handbilling and picketing."). But the category of non-picketing conduct that is nonetheless coercive is limited by the First Amendment and, as shown above, does not extend to the union's use of banners and inflatable rats on the record in this case. *See id.* at 723 ("[T]he Supreme Court has cautioned us to be especially careful not to label expressive union conduct as coercive if such an interpretation could interfere or limit free speech."). Put another way, the union's use of those props cannot reasonably be deemed a message "by which a person of ordinary fortitude would be intimidated." *Sheet Metal Workers Local 15*, 491 F.3d at 439 (holding that a mock funeral performed in front of a hospital "may have been unsettling or even offensive," but was not coercive under Section 8(b)(4)).

For these reasons, even viewing the record in the light most favorable to the Regional Director, Local 150's use of stationary banners and inflatable rats at secondary employer locations was constitutionally protected and thus not proscribed by the NLRA. The court

therefore will grant summary judgment to Local 150, and deny summary judgment to the Regional Director, as to the use of rats and banners.

This result finds support in the ALJ's decision in Local 150's favor regarding the rats and banners. Although this court is not reviewing the ALJ's opinion and owes it no deference, the "opinion is nonetheless relevant to the propriety of" injunctive relief because "the ALJ's factual and legal determinations supply a useful benchmark against which the [Regional] Director's prospects of success may be weighed." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).

The Regional Director argues that "the ALJ failed to address the central issue in this case," which is whether Local 150's "use of inflatable rats and banners, by themselves and jointly, was tantamount to unlawful secondary picketing and signal picketing … or at least constituted unlawfully coercive non-picketing conduct." Doc. 101 at 2. In fact, the ALJ devoted several pages to explaining her conclusion that Local 150's use of rats and banners in the absence of traditional picketing was constitutionally protected and not proscribed by the NLRA as signal picketing or otherwise unlawful secondary activity. Doc. 96 at 31-35. The ALJ did reach the opposite result as to the union's use of banners and rats at Elmhurst-Chicago Stone and Boughton during picketing activity in the vicinity of those locations. *Id.* at 35-38. But the Regional Director neither brings evidence of that simultaneous picketing activity to the court's attention nor presses for an injunction based thereon, thereby forfeiting the point. *See Gates*, 916 F.3d at 641 ("The district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]."); *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *G & S Holdings*

*LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court.").

The Regional Director's other arguments fare no better. First, the Regional Director suggests that Local 150's picketing activity at WillCo Green violated the NLRA. Doc. 90 at 7-9. Specifically, he argues that even if WillCo Green and Donegal were joint employers, Local 150 violated the *Moore Dry Dock* standards, *see Sailors' Union of the Pac. (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950), for common situs picketing by picketing WillCo Green's main gate rather than the gate reserved for Donegal personnel. Doc. 90 at 8. But Local 150 was entitled to picket at WillCo Green's own entrance because, as a joint employer with Donegal, WillCo Green had ceased to be a neutral secondary protected by Section 8(b)(4). *See McDonald's USA, LLC*, 363 N.L.R.B. No. 92, slip op. at 7 (2016) (noting that "a joint-employer finding" regarding fast food franchisees would "eliminat[e] secondary boycott protection that the [NLRA] would otherwise afford a franchisee in the absence of joint-employer status"). In any event, the Regional Director's argument assumes that the activity directed at WillCo Green was in fact a "picket," but as the court has already explained, that assumption is wrong.

The Regional Director also suggests that Local 150's activity at WillCo Green amounted to unlawful recognitional picketing in excess of thirty days in violation of Section 8(b)(7). Doc. 90 at 9; *see* NLRA § 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C) (making it an unfair labor practice for a union or its agents "to picket or cause to be picketed, or threaten to picket or cause to be picketed any employer" with a recognitional object unless one of several conditions is satisfied, including that the picketing take place for less than thirty days without an election petition being filed). But again, Local 150 was not engaged in picketing at WillCo Green. *See NLRB v. United Furniture Workers of Am.*, 337 F.2d 936, 939 (2d Cir. 1964) ("Section 8(b)(7)(B) can be invoked

only when 'picketing' is present … ."). Nor does the Regional Director direct the court to any evidence showing that the Local 150 activity at WillCo Green was recognitional in object.

Next, the Regional Director points to Local 150's threat to picket Boughton if it allowed RSS to pick up materials for Donegal. Doc. 90 at 9. The record does suggest that Local 150's threat concerned "picketing activity," thereby extending beyond the mere use of inflatable rats and stationary banners. Doc. 75-11 at 13. But if RSS was indeed Donegal's ally—as Local 150 argues, Doc. 76 at 8, and the Regional Director does not contest—it was permissible for Local 150 to picket RSS. *See Kable Printing Co. v. NLRB*, 545 F.2d 1079 (7th Cir. 1976) (holding that a secondary employer acting as an "ally" of the primary employer was not protected by Section 8(b)(4)). Although RSS being Donegal's ally would not have allowed *all* picketing at a common worksite shared by the two firms, some picketing directed at RSS would have been permitted. *See Tri-Gen Inc. v. IUOE, Local 150*, 433 F.3d 1024, 1042 (7th Cir. 2006) ("When a union complies with the *Moore Dry Dock* standards for common situs picketing, the picketing is presumed to be lawful primary activity."); *Moore Dry Dock*, 92 N.L.R.B. at 549 ("[P]icketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer."). And while Local 150 did not expressly limit its threat to Boughton to activity narrowly directed at RSS, the Regional Director does not argue that the lack of such an express limit made the threat illegal. *See IBEW, Local Union 357 (Desert Sun Enters. Ltd.)*, 367 N.L.R.B. No. 61, slip op. at 2 (2018) ("A union's broadly worded and unqualified notice, sent to

15

a neutral employer, that the union intends to picket a worksite the neutral shares with the primary employer is inherently coercive. Without any details, such a notice is ambiguous about whether the threatened picketing will lawfully target only the primary employer or will unlawfully enmesh the neutral employer."). The Regional Director therefore forfeits any argument that the ambiguity of Local 150's threat—as opposed to its mere existence—rendered it illegal, and accordingly fails to present a material factual dispute as to whether Local 150's threat toward Boughton was illegal. *See Gates*, 916 F.3d at 641; *Nichols* 755 F.3d at 600.

Although the ALJ reached the contrary result as to Local 150's threat to picket RSS at Boughton's worksite, she did so not because the threat itself was unlawful, but because the evidence before her showed that Boughton had reason to believe that Local 150 was implicitly threatening to banner it alongside otherwise permissible picketing. Doc. 96 at 37. Here, the Regional Director argues neither that such an implied threat was made nor that the combined effect of hypothetical picketing and bannering made the threatened activity unlawful. He therefore forfeits any argument based on the ground cited by the ALJ for her conclusion.

Finally, the Regional Director argues that "[t]he record is filled with examples of recognitional conduct [against Donegal] for more than 30 days" without a valid election petition on file, in violation of Section 8(b)(7)(C). Doc. 90 at 10-11. The ALJ found in the Regional Director's favor on this issue, Doc. 96 at 21-22, and there may be factual support for his position in the record here. But Local 150 observes—and the Regional Director does not contest—that it ceased picketing Donegal in September 2018 and therefore that there remains no relevant activity to be enjoined. Doc. 76 at 9. The Regional Director's only response is to suggest that because he has not approved Local 150's settlement of the charges concerning recognitional picketing of Donegal, the request for an injunction is not moot. Doc. 90 at 10. But that

perfunctory argument, presented without elaboration, cannot carry the Regional Director's burden of justifying an injunction based on unlawful recognitional conduct. *See W. T. Grant Co.*, 345 U.S. at 633; *Morio v. IUOE, Local Union No. 94-94A*, 1979 WL 1845, at *3 (S.D.N.Y. Feb. 26, 1979) ("Courts have, in other cases, been sensitive to the possibility that a union may voluntarily cease allegedly wrongful conduct following the commencement of litigation, thereby laying the foundation for an argument that the case was moot, but with no assurance that the union would not revert to its prior course of conduct once the litigation was terminated. Where substantial risk of such a ploy is present, the litigation will not be dismissed as moot. However, no such factors are apparent in the case at bar.") (citation omitted).

## Conclusion

Local 150's motion for summary judgment is granted and the Regional Director's motion for summary judgment is denied. The Regional Director's petition for a preliminary injunction is denied.

April 2, 2020

_____
United States District Judge